**TENNESSEE PRODUCTS & CHEMICAL CORPORATION, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 2455.**

United States District Court
M. D. Tennessee,
Nashville Division.

Findings and Conclusions Feb. 5, 1960.

Memorandum Feb. 7, 1961.

---

William Waller, Sr., Waller, Davis & Lansden, Nashville, Tenn., for plaintiff.

Robert W. Kernan, Tax Div. Dept. of Justice, Washington, D. C., Fred Elledge, Jr., U. S. Atty., Nashville, Tenn., for defendant.

WILLIAM E. MILLER, Chief Judge.

The above-entitled civil action, having come on regularly for trial before the Court sitting without a jury, plaintiff appearing by its attorney, William Waller, Nashville, Tennessee, and the defendant appearing by its attorneys, Fred Elledge, Jr., United States Attorney for the Middle District of Tennessee, and Robert W. Kernan, Tax Division, United States Department of Justice, Washington 25, D. C., and due consideration having been given to the pleadings, stipulations of the facts and exhibits, testimony and briefs on file, the Court now enters the following findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure, 28 U.S.C.A.

Findings of Fact

1. This action arises under the laws of the United States provided for internal revenue and is brought to recover income taxes paid by plaintiff for the years 1942 and/or 1946.

2. Tennessee Products and Chemical Corporation, formerly Tennessee Products Corporation, hereinafter referred to as the taxpayer, is a Tennessee corporation, incorporated on July 20, 1917.

3. On July 1, 1929, taxpayer's board of directors authorized a salary of $36,000 per annum for W. J. Cummins, its chairman of the board. During the period involved, Mr. Cummins was at all times chairman of the board of directors and Mr. Frederic Leake was president and general manager of the taxpayer. Mr. Cummins was also a stockholder of the taxpayer owning 10% or 15% of the total outstanding stock.

4. The taxpayer carried on its books an accounts receivable ledger account entitled "W. J. Cummins' Personal Account, Nashville Office".

5. It was the custom for Mr. Cummins to have his personal bills paid by the taxpayer and charged to this account.

6. Mr. Cummins' main function with taxpayer was to procure business and obtain additional capital.

7. Mr. Cummins was considered to be the driving force behind the company, representing the brains of the company and the one person to whom everyone looked for leadership and to make the company a success.

8. On March 16, 1931, the executive committee of the taxpayer of which Mr. Cummins was also chairman, met in the offices of the company in Nashville, Tennessee. The agreement reached at this meeting is reflected in the minutes of that meeting as follows:

"The Chairman stated that the President wanted authority to cut the executives' salaries and all other salaries that were necessary, to try to keep ourselves in black; that Mr. Foster and the President himself all thought that the first quarter of this year might be in "red" and were doing their best to hold it in black, but that we were positive the second quarter would show heavy losses, and for this reason, the President should have the power to cut salaries wherever he thought best; that previously when we went thru the last depression, on all salaries that were cut in our organization, we put the cut to the credit of the executive or individual but with the distinct understanding that he could not draw any part of it until the return of enough good business to justify same, and this was carried over a long period, and all reductions repaid in full.

"Further, the Chairman wanted to make a motion that on all the cuts in the salaries of the executives, or department men, it be understood that in cases where it was absolutely necessary, they could continue drawing what they absolutely had to have to sustain themselves, and that any such amount so drawn over and above the salary set by the President and Executive Committee would be charged to the executive or individual account, showing in overdraft form. All this with the distinct understanding that when business returned to where it was as good as when each executive or individual, salary was cut, then the cut should be returned to the individual either in credit form against his overdraft, or in cash in case any amount was due him, up to the amount of the cut. He said to speak plainly about his own case, that on account of his heavy purchases of the Common Stock of our corporation, which our banks had agreed to help him carry, he had a program laid out on which he would have to pay something on each of these notes as they matured and the interest as well; that his life insurance, and fire insurance, was a large factor; that his taxes were a large factor, and the interest on these bank notes was heavy; therefore, he would have to meet these as the emergency arose with his bankers, insurance people, and tax people, and if his salary was cut below the point where he could not "carry on" then he would be allowed to overdraw up to the amount of his original salary, but would owe that debt to the company, and would have to work it out and pay same, or until good business returned to the point where this cut would be returned to him, as per statement made above. In other words, the only change would be, instead of crediting it to his account, but would show as an overdraft, if it was, and charged to said person, but in no amount over his regular salary that had been originally voted to him by the Board of Directors.

"After a thorough discussion of Mr. Cummins' explanation and proposition, it was deemed fair and just to all parties that this be done, and whatever overdrafts there were, the parties would be held responsible and must pay same in time, or until it was credited back to them upon the resume of good business.

"The motion was made, duly seconded and unanimously carried.

"There being no further business, the meeting was adjourned after motion had been duly made, seconded and unanimously carried."

9. In accordance with the above agreement there was credited against Mr. Cummins' personal account a salary of $1,000.00 a month up to and including August 1934 and charges for the period 1933 to February 29, 1936, totaling $75,418.27. A cash credit of $150.87 on December 29, 1936, reduced this amount to $75,267.40.

10. Under the terms of the agreement of March 16, 1931, as fairly construed, it was the taxpayer's obligation to credit to Mr. Cummins' account the amount of the salary cut upon the resumption of good business conditions or to pay the salary cut directly to him if there were no overdrafts.

11. The resumption of good business is defined in the agreement of March 16, 1931, to be when business returns to where it was as good as when each executive or individual's salary was cut.

12. The business conditions of the taxpayer at the time the salaries were cut was not good, the probabilities being that the first quarter would reflect losses and a certainty that there would be losses in the second quarter of that year.

13. Good business conditions within the intendment of the agreement of March 16, 1931, were resumed by taxpayer in 1940.

14. W. J. Cummins died on or about February 24, 1936. At the time of Mr.

Cummins' death taxpayer was being operated under the auspices of the United States District Court for the Middle District of Tennessee and had been operating under that Court's orders since August 30, 1934, at which time a petition for reorganization under Section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207 had been filed.

15. Notwithstanding the petition for reorganization Mr. Cummins was very optimistic concerning the business future of taxpayer up until the date of his death.

16. On March 23, 1936, Frederic Leake, president of the taxpayer was granted "letters of administration" by the County Court of Davidson County, Tennessee.

17. On December 18, 1936, Frederic Leake as administrator suggested the insolvency of Mr. Cummins' estate, having ascertained that the personal assets of said estate did not exceed in value $10,000 and that debts against said estate would probably amount to $100,000 or more. On this same date the County Court Clerk ordered Mr. Leake as administrator to give notice to all persons having claims against Mr. Cummins' estate to appear and file same in the Clerk's office. Taxpayer filed a claim against Mr. Cummins' estate on April 1, 1937, for $75,267.40.

18. The president of taxpayer, as administrator of Mr. Cummins' estate, did not file an exception to taxpayer's claim within the requisite statutory period.

19. The Probate Court did not pass upon the merits of taxpayer's claim nor did it adjudicate its validity under the laws of the State of Tennessee. It merely approved *pro forma* the administrator's *pro rata* payment of a part of taxpayer's claim. The validity of the alleged debt, therefore, was never before the Probate Court, except in a *pro forma* manner.

20. In 1942 taxpayer received a dividend of .009909 on its claim against Mr. Cummins' estate, it having received a check from the attorney for the estate in the amount of $745.76. Taxpayer also received $487.10 in 1946 on this same claim.

21. On June 30, 1942, taxpayer charged against its reserve for bad debts the balance of the account of W. J. Cummins, $74,521.64.

22. In its income tax return filed for the year 1942 there is reflected this charge to reserve for bad debts. Schedule "G" of the return appears as follows:

Bad Debts

Charged to reserve for bad debts

| | | |
|---|---|---|
| W. J. Cummins | $74,521.64 | |
| John Mc. E. Bowman | 21,688.09 | |
| Considered worthless prior 1942 | | $96,209.73 |

Charge to bad debts-profit and loss

| | | |
|---|---|---|
| W. A. Bentley | 547.82 | |
| Cumberland Iron Company | 11,361.24 | |
| | 525.00 | |
| | | $12,434.06 |

23. This 1942 return was filed by Alvin Foster, vice-president and H. Lackey, treasurer of the taxpayer. It was prepared on or about May 14, 1943,

by Claude W. Hupp, Certified Public Accountant, a member of the staff of Lybrand, Ross Bros. and Montgomery Accounting Firm from information obtained through a balance sheet examination of the accounts of the taxpayer and from inquiries made of officers and members of the taxpayer during the course of the examination.

24. Taxpayer which for corporate purposes carried reserves against bad debts was on the specific charge-off method for deducting bad debts for income tax purposes.

25. The federal income tax returns for taxpayer for the years 1936 through 1941 reflected losses and/or income for these years as follows:

| | Loss | Income |
|------|--------------|--------------|
| 1936 | $344,458.20 | |
| 1937 | 131,717.37 | |
| 1938 | 369,519.26 | |
| 1939 | 24,702.22 | |
| 1940 | | $254,131.45 |
| 1941 | | 867,816.78 |

26. On December 29, 1954, taxpayer filed timely claims for refund for 1942 and 1946 raising the issue presented in this suit.

27. The agreement set forth in Finding Number 8 did not give rise to an immediately enforceable debt since Mr. Cummins did not have to repay taxpayer until taxpayer had shown that it had continued in a poor business condition over a reasonably long period of time. There was, therefore, no debt in existence within the meaning of the bad debt provision of the Internal Revenue Code until taxpayer had shown that this contingency had occurred.

28. In any event any debt evidenced by the overdraft account was one that was to be extinguished upon the occurrence of a condition subsequent, that is, the return of good business conditions, and that condition had occurred before 1942. Therefore, by the terms of the agreement, there was no debt in existence in 1942 for which taxpayer could take a bad debt deduction.

29. The salary cut of $24,000.00 per year under the agreement of March 1931 was to accumulate to the credit of Mr. Cummins, and from the date of such agreement (March 1931) until the date a petition for reorganization of the corporation was filed under the Bankruptcy Act in August 1934 the amount of the salary cut which accumulated to his credit exceeded the amount of the said overdraft and was sufficient to discharge it when applied as a credit under the said agreement of March 1931.

## Conclusions of Law

1. This Court has jurisdiction of this cause and the parties thereto by virtue of 28 U.S.C.A. § 1346(a) (1).

2. Taxpayer has the burden of proving that the parties intended to create a debtor-creditor status and that a debt in fact existed. Clark v. Commissioner, 18 T.C. 780, affirmed per curiam, 2 Cir., 205 F.2d 353.

3. In order for there to be a debt within the meaning of the Internal Revenue Code bad debt provisions, there must be an unconditional obligation on the part of another to pay the taxpayer. Inman-Poulsen Lumber Co. v. Commissioner, 9 Cir., 219 F.2d 159; Bercaw v. Commissioner, 4 Cir., 165 F.2d 521.

4. If the liability is conditioned on the happening of an event in the future, such in futuro liability does not give rise to a debt. Not until the contingency occurs is there any debt in existence. United States v. Virgin, 5 Cir., 230 F. 2d 880; Clark v. Commissioner, supra; Alexander & Baldwin v. Kanne, 9 Cir., 190 F.2d 153.

5. If there is in existence a debtor-creditor relationship in this case, it must stem from the employer-employee relationship between Mr. Cummins and the taxpayer and the modification of the terms of that relationship by the agreement of March 16, 1931.

6. The agreement of March 16, 1931, and the facts surrounding its adoption, indicate an intention of the

parties that an enforceable debt was to arise on the part of Mr. Cummins only if a reasonable period of time elapsed and the taxpayer had not resumed good business conditions. Under this construction, there was no definite fixed obligation on the part of Mr. Cummins to repay the overdrafts until a reasonable period of time had expired and the taxpayer had shown that it had not returned to a good business position. Therefore, there was not a present debt but only a debt to arise on the contingency of a lapse of time without restoration of good business conditions. Assuming that the agreement gave rise to a debt which came into existence immediately, this avails the taxpayer nothing for the remainder of the agreement provides in effect that the debt is to be extinguished when good business conditions are resumed. This condition of the agreement had occurred and the alleged debt was, accordingly, extinguished. The obligation to extinguish the debt upon the resumption of good business conditions was not affected by the death of Mr. Cummins since it did not discharge taxpayer from the duty of compensating for services already rendered. Stanley v. Kimball, 80 N.H. 431, 118 A. 636; Leahy v. Cheney, 90 Conn. 611, 98 A. 132, L.R.A.1917D, 809; Preble v. Preble, 115 Me. 26, 97 A. 9.

7. Under the terms of the agreement of March 1931 it was the duty of the taxpayer to discharge the overdraft of Mr. Cummins upon the return of good business conditions by applying thereto the salary cut which had accumulated to his credit. Thus, in 1942 the taxpayer, having resumed good business conditions, had in its possession the means to pay and discharge any debt owing by Mr. Cummins by reason of the overdraft and consequently it cannot be said that such debt was worthless in 1942.

8. The validity of the alleged debt was never before the Probate Court except in *pro forma* manner and, therefore, its approval of the administrator's account is not binding on this Court.

Goodwin's Estate v. Commissioner, 6 Cir., 201 F.2d 576; First-Mechanics Nat. Bank of Trenton v. Commissioner, 3 Cir., 117 F.2d 127, 132 A.L.R. 1459; First National Bank of Montgomery v. United States, decided August 28, 1959, (D.C. Ala.), 176 F.Supp. 768.

9. Taxpayer has not met its burden of proving that the parties here intended to create a debtor-creditor relationship or that a debt in fact existed in the year 1942 for which it could take a bad debt deduction.

### Memorandum

In this action the Court heretofore filed its Findings and Conclusions to the effect that the plaintiff had failed to establish its claim and that it was not entitled to the relief sought. Thereafter the plaintiff filed its motion under Rules 52 and 59 requesting the Court to amend, supplement, and revise its Findings of Fact and Conclusions of Law and to grant the plaintiff a new trial. Later, the plaintiff filed a supplement to its motion under Rules 52 and 59 for the purpose of submitting pertinent portions of the record in the 77B reorganization proceedings of which the Court is requested to take judicial notice. The questions raised by the plaintiff's motion, as supplemented, have been briefed and argued orally by the respective parties.

The thrust of the plaintiff's argument is, first, that any claim of Mr. Cummins or his estate based upon the contractual arrangement reflected in the Executive Committee minutes of March 16, 1931 could not, as a matter of law, have survived the plaintiff's petition, reorganization and discharge under Sec. 77B of the Bankruptcy Act; and secondly, that the allowance of the plaintiff's claim against the Cummins estate in the Chancery Court insolvency proceedings established finally the claim of the plaintiff as an indebtedness against the Cummins estate and necessarily had the effect of extinguishing any condition growing out of the Executive Committee minutes which would defeat or terminate such indebtedness.

To decide these pertinent and controlling issues, it is necessary to analyze the agreement as reflected by the Executive Committee minutes of March 16, 1931 to determine the nature of the rights and obligations created thereby. As clearly reflected by the minutes, the purposes of the meeting were (a) to authorize a reduction in the salaries of the executive officers of the corporation due to its poor financial condition at that time; and (b) to fix and determine the conditions upon which such reduction would be made. At the outset, the Chairman (Mr. Cummins) called attention to the fact that a similar reduction in salaries had been made during the last depression. This was accomplished by placing the reduction in salary to the credit of the individual affected "but with the distinct understanding that he could not draw any part of it until the return of enough good business to justify same, and this was carried over a long period, and all reductions repaid in full." As the minutes reflect in the next succeeding paragraph, the Chairman desired to propose a similar arrangement in the present instance, but with one important difference, i. e., that it be understood that "in cases where it was absolutely necessary, they could continue drawing what they absolutely had to have to sustain themselves, and that any such amount so drawn over and above the salary set by the President and Executive Committee would be charged to the executive or individual account, showing in overdraft form." Then follows the sentence which is of crucial significance in the present case: "All this with the distinct understanding that when business returned to where it was as good as when each executive or individual salary was cut, then the cut should be returned to the individual either in credit form against his overdraft, or in cash in case any amount was due him, up to the amount of the cut." This language would appear very clearly to convey the meaning that the reduction in salary was not an absolute reduction but a conditional one, the condition being that the cut or reduction in salary should be restored, either in cash or in the form of a credit against any overdraft represented by withdrawals, "when business returned to where it was as good as when" the reduction was effected. The minutes then proceed to recite the detailed reasons why Mr. Cummins, in his own case, would expect to make withdrawals from the company, due to his fixed obligations represented largely by heavy purchases of stock of the corporation. In the event of such withdrawals, the minutes recite that the individual making the withdrawal "would owe that debt to the company, and would have to work it out and pay same, or until good business returned to the point where this cut would be returned to him, as per statement made above. In other words, the only change would be, instead of crediting it to his account, but would show as an overdraft, if it was, and charged to said person, but in no amount over his regular salary that had been originally voted to him by the Board of Directors." The minutes then continued to recite that a thorough discussion of Mr. Cummins' proposal was entered into, that it was deemed fair and just to all parties, and "that whatever overdrafts there were, the parties would be held responsible and must pay same in time, or until it was credited back to them upon the resume of good business."

Aside from the "condition precedent" theory to the effect that under the terms of the agreement any overdraft represented by withdrawals would not be a recoverable or enforceable debt against the individual officer unless and until it was shown that a reasonable time had elapsed and that the corporation had not resumed a good business condition, the Court is unable to escape the conclusion, after a careful examination of the Executive Committee minutes, that the parties intended that any overdraft still existing should be extinguished or cancelled upon the resumption of good business conditions on the part of the corporation. Conceding for purposes of argument that such an overdraft under the terms of the

minutes would become a valid and enforceable debt after the lapse of a reasonable time, good business conditions not having resumed, the fact remains that the parties expressly contracted, as the Court construes the words employed, to wipe out or destroy or cancel such indebtedness upon the occurrence of a condition subsequent, i. e., "when business returned to where it was as good as when" the cut was made or effected. The purpose to impose such a "condition subsequent" would appear to be one of the fundamental facets of the agreement between the parties as reflected by the entire language used, as well as by the background of the proposal and the attendant circumstances. The idea underlying the entire proposal was that the reduction in salary was merely a temporary expedient to tide the corporation over during a period of financial stress, but with full protection to the officers concerned and with full right to restoration of their salary reductions, if the corporation should weather the storm and resume its former condition of financial soundness.

■ With this analysis in mind, the contentions of the plaintiff may be more clearly focused and understood. First, as to the 77B reorganization proceeding, the pertinent records of which the Court will take judicial notice, the Court finds nothing either in the applicable statutes or in the proceeding itself which would have required Mr. Cummins to file any kind of claim to protect his interest in the event the condition subsequent should arise. At the time of the proceeding he had no claim and he was not a creditor of the corporation. He was at most a debtor of the corporation having a conditional defense, i. e., the right to defeat the debt if a specific condition later occurred. The condition which would defeat the indebtedness of the corporation against himself had not at that time occurred and might never have occurred. It is true that the indebtedness represented by the overdraft against Mr. Cummins was listed and carried as an asset in the reorganization proceeding, but if this fact be true it is also true that the asset itself was subject to the condition subsequent expressly attached to it by the terms of the agreement between the parties. The fact that it was carried on the books of the corporation as an indebtedness against Cummins could not, of course, alter the terms of the agreement which brought the debt into existence. Viewed in this light, it was not necessary for Mr. Cummins to assert a claim to a condition subsequent in the bankruptcy proceeding, for the condition subsequent itself was an essential part of the indebtedness and was inextricably interwoven with it. If the debt was carried as an asset of the corporation, it was necessarily subject to the condition that it would be extinguished upon the resumption of good business conditions, as the minutes clearly recited. This condition was self-executing and required no decree of court to establish it. No authority is cited by plaintiff to support its argument that such a condition would be barred unless asserted in the reorganization proceeding. That proceeding in no way affected or impaired defenses of debtors of the corporation.

■ By parity of reasoning, it would appear that the Chancery Court insolvency proceeding cannot be regarded as having affected or destroyed the condition subsequent. It is true, as the plaintiff correctly sets forth in its motion, that the record in this case fairly shows that the Chancery Court proceeding was an adversary proceeding; that there were a number of creditors whose claims were filed and allowed, each of whom had an adverse interest to the allowance of other claims; and that the claim of plaintiff was reported by the Clerk and Master and allowed by the court with the consent, express or implied, of all other creditors, including the representatives of the estate of Mrs. Cummins, which had acquired the claim of a Mrs. Watson, who had asserted the largest claim aside from that of plaintiff. This being true the Court is persuaded that the plaintiff is correct in insisting that

the Chancery Court decree in allowing the plaintiff's claim is binding upon this Court to the extent that the indebtedness must be recognized by this Court as an obligation then enforceable against Mr. Cummins' estate under the conditions at that time obtaining. But the question as to whether such indebtedness, so reduced to judgment, was subject to be defeated by the condition subsequent was not before the Chancery Court in the insolvency proceeding, and it was not adjudicated either expressly or impliedly. Nor would it have been proper for this issue to have been injected into the proceeding at that time. If it had been injected into the case, the most the Chancery Court could have done would have been to make a declaration that the recovery might later be defeated by the occurrence of the condition subsequent, or that if the debt in the meantime had been fully paid, the Cummins estate would have the right to receive reimbursement upon the happening of the condition subsequent. But these rights were already declared and set forth by the parties themselves in the agreement, as reflected by the Executive Committee minutes. As the Court sees the matter, the Chancery Court proceeding did nothing more than to grant a recovery in favor of the plaintiff against the Cummins estate in the amount of his overdraft without in any way undertaking to affect or destroy the right of the Cummins estate to have the indebtedness cancelled, if the condition provided for by the agreement should arise in the future.

■ Taking this view of the case, the Court is compelled to overrule the motion of the plaintiff for a revision in its Findings and Conclusions, except insofar as such revision is necessarily made by this memorandum. There appears to be no doubt that good business conditions were resumed by the corporation in 1940 for the first time and, consequently, this occurrence having extinguished the indebtedness to the corporation, the plaintiff had no indebtedness to write off as a bad debt within the meaning of the income tax laws in 1942. It may be true, as argued by the plaintiff, that good business conditions were resumed as far as the company was concerned because of the reorganization proceeding. It may even be conceded that the condition subsequent would never have occurred except for the reorganization proceeding. Nevertheless, the fact remains that the agreement between the parties contained no exception in this respect, providing without reservation that the indebtedness upon the resumption of good business conditions would be paid by application of the credit due to the individual officer by reason of the salary reduction.

■ The parties by their agreement placed no time limitation upon the effectiveness of the condition subsequent, and the Court finds no reason to hold that the condition was not fully effective in 1940 because of a mere lapse of time—approximately nine years. In this connection it is significant to observe, as pointed out above, that the Chairman at the meeting of the Executive Committee in 1931 specifically pointed out that the similar arrangement which was adopted during the last preceding depression "was carried over a long period, and all reductions repaid in full." It is safe to assume, therefore, that the parties anticipated that the arrangement adopted in 1931 for a reduction in salaries might be carried over a prolonged period of time. But while this fact was understood, the intention was that the salary reductions would be restored when good business conditions were resumed, whenever that event should occur.

An order will accordingly be submitted to the Court in conformity with this memorandum overruling the motion for further or different Findings of Fact and Conclusions of Law and for a new trial, except to the extent that the Court in this memorandum has necessarily modified the Findings and Conclusions heretofore entered.