William B. PACKER, Sr. and Seaview
Investors, L.P., Plaintiffs,

v.

TDI SYSTEMS, INC. and Thomas
F. DesOrmeaux, Defendants.

No. 96 Civ. 5259(PKL).

United States District Court,
S.D. New York.

March 31, 1997.

194

Miller & Wrubel, P.C., New York City (Charles R. Jacob, III, of counsel), for Plaintiffs.

Fish & Richardson, P.C., New York City (Richard P. Ferrara, of counsel), for Defendants.

## OPINION AND ORDER

LEISURE, District Judge:

Plaintiffs brought this contract action seeking declaratory and compensatory relief in connection with a number of contracts allegedly made between plaintiffs and defendants for the purchase of certain equipment, technology, and intellectual property rights to a proprietary technology developed and patented by plaintiff corporation. Individual defendant Thomas F. DesOrmeaux moves for dismissal for lack of personal jurisdiction, pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure. For the reasons stated below, the motion is denied.

## BACKGROUND

Corporate plaintiff, Seaview Investments, L.P. ("Seaview") is a Pennsylvania corporation with its principal place of business in Blue Bell, Pennsylvania, and individual plaintiff William B. Packer, Sr., Chairman of the Board of Seaview, is a Pennsylvania resident.

Corporate defendant TDI Systems (collectively with its predecessor-in-interest, "TDI") is a Texas corporation with its principal place of business in Houston, Texas. Individual defendant Thomas F. DesOrmeaux, Chairman and Chief Executive Officer of TDI, is a Louisiana resident. In 1992, Packer and DesOrmeaux signed, in their capacities as corporate officers, a number of agreements between Seaview and TDI for the formation of a partnership under Delaware law, to be called Seaview Thermal Systems (collectively with its successor-in-interest, "STS"), and the purchase by STS of certain assets from TDI, including equipment, technology, and intellectual property in a patented waste recovery process (collectively, the "Technology").

The Purchase and Contribution Agreement, signed in Houston on September 2, 1992, contains a choice of law provision designating New York law as controlling any dispute arising from the agreements, and specifies that the closing of the transaction would take place in the New York City offices of plaintiffs' counsel. On November 18, 1992, DesOrmeaux attended the closing and signed a number of agreements and exhibits on behalf of TDI.[1] A number of the documents signed during the meeting contain a forum selection clause stating that the parties agree to the exclusive jurisdiction of the New York state courts and this Court for all disputes arising out of the agreements, and stating specifically that the clause was expressly negotiated.[2] Several of the documents also contain New York choice of law provisions, and direct that copies of service of notices be mailed to counsel in New York. In relation to the transaction, STS delivered a promissory note (the "Note") in the principal sum of $500,000, half of the purchase price, and the parties entered a security agreement giving TDI a first lien with respect to certain of the assets related to the Technology. The Note, signed by Packer on behalf of STS, contains

a forum selection clause and a choice of law clause designating New York courts and New York law.

Subsequently, STS experienced financial difficulties. In order to obtain additional financing from a lender (collectively with its successor-in-interest, the "Lender"), STS needed TDI to subordinate its indebtedness and security interest to the security agreement to be entered with the Lender. On May 26, 1993, and again on August 25, 1993, STS, TDI, and the Lender entered agreements providing for the subordination and standstill of STS's obligations to TDI under the Note. In July of 1994, STS, Packer, TDI, and DesOrmeaux entered a letter agreement (the "Letter Agreement") whereby Packer guaranteed either to pay the amount due or to buy the Note in the event that the maker, STS, failed to pay under the Note. In exchange, TDI and DesOrmeaux agreed to allow STS to go forward with its financing transaction with the Lender and to terminate TDI's lien under the security agreement signed November 18, 1992.[3] Packer and DesOrmeaux each signed the Letter Agreement both individually and on behalf of, respectively, STS and TDI. The Letter Agreement states that "[w]e refer to the promissory note (the "Note") in the principal amount of $500,-000 dated November 18, 1992." Packer Aff. Ex. 6 at 1.

Contemporaneously with the execution of the Letter Agreement, STS, TDI, and the Lender executed an agreement (the "Subordination Agreement") confirming the August 25, 1993 agreement to subordinate TDI's security interests under the original security agreement to those of the Lender. *See* Packer Aff. Exs. 12, 13. The Subordination Agreement contains a New York choice of law clause and a nonexclusive New York forum selection clause.

---

1. Only one of these documents, the ownership agreement, was signed by DesOrmeaux in his individual capacity. See Packer Aff. Ex. 4. This agreement is not the subject of the instant litigation.

2. The forum selection clause, of course, applies to the parties to the contracts, the corporate entities, and not to the individual signatories.

3. Specifically, TDI and DesOrmeaux agreed "timely to execute and deliver" any agreements necessary to enable STS to complete the financing agreements with the Lender.

It is undisputed that DesOrmeaux visited New York on only one other occasion since the 1992 closing. Plaintiffs allege that this visit occurred on or around April 20, 1993, and was in connection with the negotiation of various agreements with a number of third parties for the construction of waste processing units and financing for such projects by the Lender. *See* Packer Aff. ¶¶ 18–19. Although the wording of the affidavit is somewhat ambiguous and does not identify the precise matters alleged to have been negotiated at this meeting, plaintiffs apparently connect this negotiation to the May 26, 1993 subordination agreement among STS, TDI, and the Lender. DesOrmeaux himself, however, avers he visited New York "to attend a seminar totally unrelated to the Plaintiffs' allegations." DesOrmeaux Aff. ¶ 9 (Defs.' Mot. Dismiss Ex. B). DesOrmeaux has no ties to New York, such as maintenance of bank accounts or ownership of real or personal property in the state.

Plaintiffs' first four causes of action seek declaratory judgments that Packer is not obligated under the Letter Agreement, alleging that certain conditions stated in the Letter Agreement relating to STS's solvency had not been fulfilled; that the Letter Agreement is unenforceable by reason of duress; or that defendants' breaches of contract and of their duty of good faith and fair dealing with respect to the Letter Agreement and other agreements entered into in the overall transaction excuse Packer from performance. As a fifth cause of action, plaintiffs allege that defendants breached the agreement that TDI would subordinate its security interests in the Technology. Finally, plaintiffs allege that TDI's commencement of suit in Texas state court breached forum selection clauses contained in the Note and other documents. Defendant DesOrmeaux moves, pursuant to Rule 12(b)(2), to dismiss this action as it relates to him for lack of personal jurisdiction.

## DISCUSSION

A plaintiff facing a Rule 12(b)(2) motion bears the burden of showing that personal jurisdiction over the defendant is properly exercised. Where no discovery and no evidentiary hearing as to jurisdictional matters has been conducted, the plaintiff "need only allege facts constituting a *prima facie* showing of personal jurisdiction," and the pleadings and affidavits must be construed in the nonmoving party's favor. *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1108 (2d Cir.1997) (citing *Ball v. Metallurgie Hoboken–Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir.1990); *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 364–65 (2d Cir.1986)); *accord Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 566–67 (2d Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 508, 136 L.Ed.2d 398 (1996).

Generally, it is well-settled that a party may agree by contract to submit to jurisdiction in a given forum and that such a forum selection clause, when it is part of the contract that forms the basis of the action, will be enforced, obviating the need for a separate analysis of the propriety of exercising personal jurisdiction. *See, e.g., Jones v. Weibrecht*, 901 F.2d 17, 18 (2d Cir.1990). However, where no forum selection clause exists to govern the dispute, the court must examine the constitutional and statutory requirements for the exercise of personal jurisdiction. Due process considerations with respect to the exercise of personal jurisdiction include a nonresident defendant's "liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471–72, 105 S.Ct. 2174, 2181, 85 L.Ed.2d 528 (1985) (quoting *International Shoe v. Washington*, 326 U.S. 310, 319, 66 S.Ct. 154, 159–60, 90 L.Ed. 95 (1945)). Such constitutional limits are satisfied if a nonresident defendant has sufficient "minimum contacts" with the forum state such that exercise of jurisdiction comports with "traditional notions of fair play and substantial justice." *International Shoe*, 326 U.S. at 316, 66 S.Ct. at 158 (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 342–43, 85 L.Ed. 278 (1940)) (internal quotation marks omitted).

The two varieties of personal jurisdiction are "general jurisdiction" and "specific jurisdiction." *See Helicopteros Nacionales*

*de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 nn. 8–9, 104 S.Ct. 1868, 1872 nn. 8–9, 80 L.Ed.2d 404 (1984). General and specific personal jurisdiction differ in the level of "minimum contacts" required to satisfy the *International Shoe* test. General jurisdiction requires "continuous and systematic" contacts with the forum state.[4] *Id.* at 415, 104 S.Ct. at 1872 (quoting *Perkins v. Benguet Consol. Mining,* 342 U.S. 437, 438, 72 S.Ct. 413, 414–15, 96 L.Ed. 485 (1952)) (internal quotation marks omitted). In contrast, the level of contact necessary to support specific jurisdiction is satisfied "[w]hen a controversy is related to or 'arises out of' a defendant's contacts with the forum." *Id.* at 414, 104 S.Ct. at 1872 (quoting *Shaffer v. Heitner,* 433 U.S. 186, 204, 97 S.Ct. 2569, 2579–80, 53 L.Ed.2d 683 (1977)).

■ In addition to the constitutional considerations, state statutory requirements for specific personal jurisdiction must also be satisfied. Under New York's "long-arm" statute, a court can exercise specific personal jurisdiction "over any non-domiciliary ... who in person or through an agent ... transacts any business within the state." N.Y. C.P.L.R. 302(a)(1) (McKinney 1990). New York's statute is a "single act statute," empowering a court to exercise specific jurisdiction over a nondomiciliary on the basis of one transaction in the forum so long as the defendant's activities in New York "were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Kreutter v. McFadden Oil Corp.,* 71 N.Y.2d 460, 467, 527 N.Y.S.2d 195, 198–99, 522 N.E.2d 40, 43 (1988); *see also Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958) ("[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.").

■ In evaluating a defendant's purposeful availment of the forum, a court looks to the totality of the circumstances and may not ground jurisdiction upon "random," "fortuitous," or "attenuated" contacts. *CutCo Indus.,* 806 F.2d at 365; *accord Burger King,* 471 U.S. at 475, 105 S.Ct. at 2183–84. The New York Court of Appeals has noted that a defendant's physical presence at the time of the negotiation, making, and/or execution of a contract justifies a finding of purposeful availment. *See George Reiner & Co. v. Schwartz,* 41 N.Y.2d 648, 653, 394 N.Y.S.2d 844, 847, 363 N.E.2d 551, 554 (1977) (finding jurisdiction on the basis that defendant "was physically present in New York at the time the contract ... was negotiated and made and the contract ... was the transaction out of which the cause of action arose"); *Hi Fashion Wigs v. Peter Hammond Adver.,* 32 N.Y.2d 583, 586, 347 N.Y.S.2d 47, 50, 300 N.E.2d 421, 423 (1973) (holding that a third-party defendant's voluntary presence in the forum in order to deliver a guarantee was "so essential ... to its validity and existence as a contract" that the defendant could be deemed to have purposefully availed himself of the forum); *Parke–Bernet Galleries, Inc. v. Franklyn,* 26 N.Y.2d 13, 17, 308 N.Y.S.2d 337, 340, 256 N.E.2d 506, 508 (1970) (observing that "where a defendant was physically present at the time the contract was made" presents "the clearest sort of case in which our courts would have 302 jurisdiction").

As to the requirement of relatedness, "[a] cause of action arises out of a defendant's New York transaction when it is 'sufficiently related to the business transacted that it would not be unfair to deem it to arise out of the transacted business.'" *PDK Labs,* 103 F.3d at 1109 (quoting *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.,* 763 F.2d 55, 59 (2d Cir.1985)). Although this statement appears to be somewhat circular, the general principle that emerges is one of fairness. *See also International Shoe,* 326 U.S. at 316, 66 S.Ct. at 158 (emphasizing "traditional notions of fair play").

Plaintiffs first contend that the forum selection clause contained in the Note, or the similar clause in the Subordination Agree-

---

**4.** The parties do not dispute that (aside from the question of general jurisdiction on the basis of DesOrmeaux's alleged consent to jurisdiction) general jurisdiction would not be proper based on DesOrmeaux's contacts with the forum, which are too sporadic to constitute "continuous and systematic" contact.

ment, is incorporated into the Letter Agreement and thus is binding on DesOrmeaux personally under the Letter Agreement. Next, plaintiffs contend that DesOrmeaux's contacts with New York are sufficient to support exercise of long-arm jurisdiction over him, either as a result of his own in-state activities or by imputing TDI's in-state activities to him under an agency theory. Finally, plaintiffs appear to argue that jurisdiction over TDI can be imputed to DesOrmeaux under an *alter ego* theory.

As discussed below, the Letter Agreement does not incorporate the Note's or the Subordination Agreement's forum selection clause, and therefore DesOrmeaux's consent to personal jurisdiction cannot be established under the Letter Agreement. Further, neither DesOrmeaux's own contacts nor TDI's activities appear satisfy the requirements for exercise of long-arm jurisdiction. However, plaintiffs have demonstrated adequately, under the pleadings standard applicable to a Rule 12(b)(2) motion, that jurisdiction over DesOrmeaux as TDI's *alter ego* is proper.

### I. *Forum Selection Clause Under the Letter Agreement*

■■■■ First, plaintiffs argue that the Letter Agreement, which DesOrmeaux signed in his individual capacity and which specifically obligates DesOrmeaux to do certain acts, incorporates the Note by reference and thereby includes the Note's New York forum selection clause.[5] This Court does not agree with plaintiffs' argument that the Note should be deemed to be incorporated by reference in the Letter Agreement. It is true that the Letter Agreement alludes to the Note. Such reference is necessary in order to define the terms of the agreement among STS, Packer, TDI, and DesOrmeaux. However, the Letter Agreement does not state that the terms of the Note are *incorporated* by reference. The parties were sophisticated and, more significantly, had on previous occasions explicitly negotiated and included forum selection clauses in the documents relevant to STS transactions. If the parties intended to do so by the Letter Agreement, presumably they would have stated such intent explicitly, either by including a forum selection clause or by explicitly stating that such a clause was incorporated by reference to the Note.

■■■■ Second, plaintiffs argue that the Subordination Agreement, executed contemporaneously with the Letter Agreement and relating to the same general subject matter of STS's capital financing plan, should be construed and read together with the Letter Agreement. "[U]nder the law of New York, 'where two or more written instruments between the same parties concerning the same subject' matter are contemporaneously executed, they will be read and interpreted together." ' *Ameritrust Co. v. Chanslor*, 803

---

**5.** In 1995, TDI commenced action against Packer in Texas state court, alleging that Packer breached the Letter Agreement. The Texas court concluded that "[t]he letter agreement includes all of the terms of the Note, including the forum selection clause," and held that it lacked personal jurisdiction over Packer. *TDI Sys., Inc. v. Packer*, No 95–29837, slip op. ¶¶ 2, 4, at 2 (Dist. Ct. Tex. June 14, 1996) (Packer Aff. Ex. 1). This Court must accord full faith and credit to the judgments of a state court, and must give such a judgment the same preclusive effect that it would have under that state's law. *See* 28 U.S.C. § 1738 (1994); *Marrese v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373, 375, 105 S.Ct. 1327, 1329, 84 L.Ed.2d 274 (1985). The Texas court's decision is currently under appeal. However, § 1738 applies regardless of the pendency of appeal. *See* 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 4433 at 305 (1981).

Texas law identifies "three elements necessary to establish issue preclusion: (1) the facts sought to be litigated in the second action were fully and fairly litigated in the prior action; (2) those facts were essential to the judgment in the first action; and (3) the parties were cast as adversaries in the first action." *See Acker v. City of Huntsville*, 787 S.W.2d 79, 81 (Ct.App.Tex.1990) (citing *Bonniwell v. Beech Aircraft Corp.*, 663 S.W.2d 816, 818 (Tex.1984)). The party seeking to assert issue preclusion bears the burden of establishing these elements, *see Jones v. City of Houston*, 907 S.W.2d 871, 874 (Ct.App.Tex.1995), and plaintiffs neither assert preclusion nor make any showing as to any of the elements. In any event, the third element appears to be lacking, because DesOrmeaux was not a party to the Texas action. Although plaintiffs assert that TDI, which was a party, is DesOrmeaux's *alter ego*, as discussed below in Part III of this opinion, it is not argued that these allegations alone suffice to establish that preclusive effect should be given to the holding. Accordingly, this Court declines to give the Texas court's holding preclusive effect, and must proceed to the merits of the question.

F.Supp. 893, 896 (S.D.N.Y.1992) (quoting *Liamuiga Tours v. Travel Impressions, Ltd.*, 617 F.Supp. 920, 927 (E.D.N.Y.1985)). This doctrine is not applicable to the instruments involved in this case, because the instruments do not involve the same parties. TDI and STS are both parties to both documents; but Packer and DesOrmeaux are not parties to the Subordination Agreement.

Because plaintiffs rely so heavily on *Ameritrust* and a similar case, *Greene's Ready Mixed Concrete Co. v. Fillmore Pacific Assocs.*, 808 F.Supp. 307 (S.D.N.Y.1992), this Court deems it useful to examine the facts of those cases. In *Ameritrust*, the defendant signed in his capacity as a trustee a number of notes, security agreements, and subscription agreements that included New York forum selection clauses. He was sued in his individual capacity on a guarantee that did not contain a forum selection clause, and moved for dismissal. The Court denied the motion, primarily on the ground that "the Guarantor's unlimited assumption of the Trust's obligations assumes this consent [to New York jurisdiction] as well." *Ameritrust*, 803 F.Supp. at 896. A secondary reason offered for the holding was that the documents should be interpreted together, "especially ... when the guarantee refers to the contract whose performance is guaranteed." *Id.* The facts in *Greene's Ready Mixed* are nearly identical and the legal discussion is taken verbatim from *Ameritrust*. In this case, the Letter Agreement does not contain an assumption by DesOrmeaux of TDI's obligations under the Subordination Agreement, and in fact does not refer to the Subordination Agreement. Thus, neither the holding

nor the dicta in *Ameritrust* and *Greene's Ready Mixed* readily applies here.

## II. Long-Arm Jurisdiction

Alternatively, plaintiffs seek to invoke New York's long-arm jurisdiction over DesOrmeaux by establishing either that he personally had sufficient contacts in the forum, or that TDI had sufficient contacts under CPRL 302(a)(1) and the jurisdiction over TDI can be imputed to DesOrmeaux under an agency theory.

### A. DesOrmeaux's Contacts

 In order to find jurisdiction over DesOrmeaux under CPLR 302(a)(1), plaintiffs must show: (1) that he engaged in purposeful activity in the state, thereby invoking the benefits and protections of New York law; and (2) that the in-state activities are related to the allegations in the complaint.[6] A single contact is sufficient to show that a defendant "transacted business" within the meaning of CPLR 302(a)(1). *See Kreutter*, 71 N.Y.2d at 467, 527 N.Y.S.2d at 198, 522 N.E.2d at 43. In evaluating such contacts, the court must focus on the nature and quality, in the totality of the circumstances, of the contact. *See International Shoe*, 326 U.S. at 318, 66 S.Ct. at 159; *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 299, 100 S.Ct. 559, 568, 62 L.Ed.2d 490 (1980); *George Reiner & Co.*, 41 N.Y.2d at 654, 394 N.Y.S.2d at 848, 363 N.E.2d at 555.

DesOrmeaux's only contacts with New York were his presence at the closing and his participation in a 1993 meeting to negotiate

---

**6.** Defendants argue that the only contact DesOrmeaux had with New York that relates in any way to the complaint was his presence at the closing, and that such presence was "in his corporate capacity." Such an argument does not, in the first instance, shield DesOrmeaux from New York's long-arm jurisdiction because the Court of Appeals of New York has explicitly rejected the fiduciary shield doctrine. *See Kreutter*, 71 N.Y.2d at 472, 527 N.Y.S.2d at 202, 522 N.E.2d at 47. Thus, New York does not adhere to a rule that "an individual should not be subject to jurisdiction when his only dealings in the forum State were solely in a corporate capacity." *Id.* at 467, 527 N.Y.S.2d at 199, 522 N.E.2d at 44.

However, the fact that New York does not adopt the fiduciary shield doctrine does not mean that a corporate officer is automatically subject to long-arm jurisdiction. *See id.* (holding merely that "the fiduciary shield rule is not *available to defeat jurisdiction* under the New York long-arm statute"); *see also Calder v. Jones*, 465 U.S. 783, 790, 104 S.Ct. 1482, 1487, 79 L.Ed.2d 804 (1984) (holding that petitioners' "status as employees does not somehow insulate them from jurisdiction," but that "[e]ach defendant's contacts with the forum State must be assessed individually"). Thus, plaintiffs still must demonstrate either that DesOrmeaux's physical presence satisfies the requirements of the long-arm statute, or that jurisdiction over TDI can be imputed to DesOrmeaux under a theory of agency.

construction financing by the Lender.[7] DesOrmeaux's attendance at the closing involved only the actual execution and delivery of agreements relating to the creation of STS. There is no allegation that he negotiated or made these agreements while in New York. Rather, DesOrmeaux was present in the state solely for the purpose of signing documents reflecting agreements previously negotiated and made. Furthermore, only two of the documents executed during the 1992 visit—the Note and the security agreement—appear to have any relevance to the instant action. Moreover, even these two documents do not appear to be "sufficiently related" to the cause of action such that "it would not be unfair to deem [the action] to arise out of the transacted business." *Hoffritz for Cutlery*, 763 F.2d at 59. Rather, plaintiffs' complaint arises mainly out of the Letter Agreement.

DesOrmeaux's alleged participation in a 1993 negotiation with the Lender is similarly a limited contact of questionable relevance to the allegations in the complaint. First, it is alleged only that DesOrmeaux participated in negotiations while in New York, not that any agreement was made or executed in New York. Second, even if an agreement had been reached during the negotiation, the resulting contract, presumably the May 26, 1993 subordination agreement, did not give rise to the instant litigation. Only by viewing the May 26, 1993 agreement as a predecessor to the August 25, 1993 agreement, which in turn was confirmed by the Subordination Agreement, which was executed contemporaneously with DesOrmeaux's execution of the Letter Agreement—which is ultimately the subject of the

instant action—can the alleged April 20, 1993 negotiation be seen as related to the complaint.

Given the attenuated nature of the contacts alleged by plaintiffs, the exercise of jurisdiction is not justified. Plaintiffs' allegations against DesOrmeaux do not relate to the documents signed in New York, or to the financing arrangements allegedly negotiated in New York, in any direct manner. Moreover, DesOrmeaux was not bound by any of the documents signed in New York, except an ownership agreement, *see* Packer Aff. Ex. 4, which did not in any way give rise to the instant action.[8] In light of the overall circumstances, the nature and quality of DesOrmeaux's contacts are not sufficient to support long-arm jurisdiction under the "transaction" provision of the New York statute. *Cf. George Reiner & Co.*, 41 N.Y.2d at 653, 394 N.Y.S.2d at 847, 363 N.E.2d at 554 (defendant "negotiated and made" the contract in New York and thereby transacted business under the statute); *Hi Fashion Wigs*, 32 N.Y.2d at 586–87, 347 N.Y.S.2d at 49–50, 300 N.E.2d at 422–23 (defendant's delivery of a personal guarantee of a corporate debt "constituted acceptance of the contract" and therefore the in-state delivery constituted a transaction of business); *see generally* N.Y. C.P.L.R. 302, cmt. 302:10 at 92 (McKinney 1990) (observing that presence in the forum "just to negotiate the contract or just to execute the contract" as a test of forum contact "should not depend on any *a priori* formula but must be determined as the facts present themselves," and that in such a determination, "the number and duration of the visits to New York will be critical").

---

**7.** As to the nature of DesOrmeaux's second visit to New York, the apparent conflict between Packer's affidavit and DesOrmeaux's must, for the purposes of this motion, be resolved in plaintiffs' favor. The Court must "assume[] the truth of the plaintiff[s'] factual allegations" and construe the affidavits in plaintiffs' favor. *Ball*, 902 F.2d at 197; *see PDK Labs*, 103 F.3d at 1108. Moreover, DesOrmeaux's account of the purpose of his later visit to New York is not necessarily in conflict with Packer's affidavit, in that DesOrmeaux merely states that he came to the state "to attend a seminar." It is possible that, after coming to the state for the purpose of attending a seminar, he became involved in the negotiation

alleged by plaintiff. Because of the pleadings standard applicable to a Rule 12(b)(2) motion, however, the Court need not engage in such speculation.

**8.** Thus, although DesOrmeaux in a literal manner purposefully availed himself of the forum and invoked the benefits and protections of its laws by agreeing to the New York forum selection and choice of law clauses in the ownership agreement, the acts complained of do not arise out of or in any way relate to these purposeful activities. Accordingly, long-arm jurisdiction cannot be asserted upon the basis of this contact.

## B. Imputed Long–Arm Jurisdiction

New York cases also establish that even when a corporate officer's contacts with the forum are insufficient—for example, if the officer has never entered the state—long-arm jurisdiction over the corporation can be imputed to the officer so long as the corporation can be deemed to have acted in the forum as the corporate officer's agent such that the actions are attributable to the officer. *See, e.g., Retail Software Servs. v. Lashlee,* 854 F.2d 18, 22 (2d Cir.1988); *Kreutter,* 71 N.Y.2d at 463, 473, 527 N.Y.S.2d at 196, 202–03, 522 N.E.2d at 41, 47. A plaintiff need not show a formal agency relationship, but rather must establish "that [the purported agent] engaged in purposeful activities in this State in relation to [the transaction complained of] for the benefit of and with the knowledge and consent of the [non-forum] defendants and that they exercised some control over [the purported agent] in the matter." *Kreutter,* 71 N.Y.2d at 467, 527 N.Y.S.2d at 199, 522 N.E.2d at 41, 44.

The *Kreutter* case establishes that jurisdiction over one entity under CPLR 302(a)(1) can be imputed to other entities, including an individual corporate officer. Other cases have extended the *Kreutter* court's reasoning to hold that such imputed jurisdiction can also apply when the underlying jurisdiction as to the purported agent exists under other subdivisions of CPLR 302. It remains necessary, however, to demonstrate that some form of long-arm jurisdiction can be properly exercised over the corporation before imputing anything to the corporation's officer. In this case, the only ground of long-arm jurisdiction over TDI that is contended to exist is that under CPLR 302(a)(1). In this case, TDI's forum contacts do not meet the required standard.

TDI's contacts with the forum are only slightly more substantial than DesOrmeaux's individual contacts. Arguably, by voluntarily entering the forum to attend the closing, the corporation in a literal manner availed itself of the privilege of conducting business in the state and invoked the benefits and protections of the forum's laws by executing documents containing New York forum selection and choice of law clauses. TDI's other alleged contact with New York consists of its alleged participation, via its representative DesOrmeaux, in a single negotiation, of unspecified duration, with STS and its potential customer, contractor, and/or Lender, on or around April 20, 1993. As noted above with regard to DesOrmeaux's own contacts, however, these contacts have only an attenuated relationship to the allegations in the complaint. In light of the totality of the circumstances, it does not appear that it would be fair to deem the action to have arisen out of TDI's purposeful activities in the forum. Accordingly, no basis for long-arm jurisdiction exists that can be imputed to DesOrmeaux.[9]

## III. Imputed Consensual Jurisdiction

Finally, plaintiffs appear to argue that jurisdiction over TDI can be imputed to DesOrmeaux under a theory that the corporation was DesOrmeaux's *alter ego.* Plaintiffs' brief makes no distinction between imputing long-arm jurisdiction under an agency theory under *Kreutter,* on one hand, and imputing consensual jurisdiction under an *alter ego* theory, on the other. Instead, plaintiffs appear to elide the two independent grounds of jurisdiction by arguing that, because they allege facts sufficient to show that TDI was DesOrmeaux's *alter ego,* jurisdiction can be imputed based on an agency theory under *Kreutter.* As discussed above, *Kreutter* allows jurisdiction over a corporation to be imputed under an agency theory only when long-arm jurisdiction over the corporation is demonstrated. The case does not address the question of imputing jurisdiction under an *alter ego* theory when jurisdiction over the corporation exists by virtue of a forum selection clause. This question involves a separate analysis.[10] *See Kinetic In-*

---

**9.** Moreover, the Court is not convinced that plaintiffs have averred sufficient facts to establish that DesOrmeaux benefited from the specific New York transactions, as required by *Kreutter* to show an agency relationship.

**10.** It may seem unfair to introduce this analysis when plaintiffs themselves did not brief its argument in these terms, because defendant has not had the opportunity to put responsive arguments before the Court. However, plaintiffs' brief points to allegations in the complaint to the

*struments, Inc. v. Lares,* 802 F.Supp. 976, 985 (S.D.N.Y.1992) (Sand, J.) (citing *Minnesota Mining & Mfg. v. Eco Chem, Inc.,* 757 F.2d 1256, 1265 (Fed.Cir.1985); *Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 903 (2d Cir.1981); *Lakota Girl Scout Council v. Havey Fund–Raising Management,* 519 F.2d 634, 638 (8th Cir.1975)).

■■■■ A corporation's consent to jurisdiction under a forum selection clause can be applied to obtain jurisdiction over an individual officer by disregarding the corporate entity under the doctrine of piercing the corporate veil. *See id.* In determining whether the corporate entity should be disregarded, "New York law allows the corporate veil to be pierced *either* when there is fraud *or* when the corporation has been used as an alter ego." *Itel Containers Int'l Corp. v. Atlanttrafik Express Serv. Ltd.,* 909 F.2d 698, 703 (2d Cir.1990); *see also General Textile Printing & Processing Corp. v. Expromtorg Int'l Corp.,* 891 F.Supp. 946, 950 (S.D.N.Y.1995) (Leisure, J.) (holding that jurisdiction could be obtained over the individual defendant by piercing the corporate veil under the "fraud" prong)

In this case, plaintiffs make the following allegation:

58. At all relevant times, DesOrmeaux dominated and controlled TDI, disregarded TDI's corporate existence and treated TDI as his *alter ego.* Such domination and control worked an injustice on Packer as more specifically set forth above and is reflected by, *inter alia:*

(a) The fact that, as of August 16, 1993 TDI forfeited its right to do business, and from February 15, 1994 to at least May, 1996 TDI forfeited its charter, as a Texas corporation, as a result of which DesOrmeaux is personally liable as to the matters herein alleged by operation of Texas law;

(b) Funds that nominally were TDI's were wired directly into a personal account of DesOrmeaux at DesOrmeaux' [sic] direction;

(c) On information and belief, TDI did not maintain many normal corporate formalities and records;

(d) TDI was inadequately capitalized for the ventures it undertook with Packer; and

(e) TDI exercised no business discretion independent of DesOrmeaux's personal wishes.

Compl. ¶ 58. There do not appear to be any allegations of fraud, and therefore plaintiffs appear to rely solely on the *alter ego* prong of the doctrine, arguing that TDI was so dominated by DesOrmeaux that the Court, for jurisdictional purposes, should disregard TDI's corporate existence.

■■■ Some of the factors taken into consideration in determining whether to pierce the corporate veil under an *alter ego* theory include: (1) the absence of corporate formalities normally attendant on corporate existence, such as issuance of stock, election of directors, keeping of corporate records, and so forth; (2) inadequate capitalization; (3) the intermingling of corporate and personal finances; and (4) the amount of business discretion displayed by the purported *alter ego* corporation. *See, e.g., Wm. Passalacqua Builders v. Resnick Developers South, Inc.,* 933 F.2d 131, 139 (2d Cir.1991) (including the above four factors among a list of ten factors to consider); *Kinetic Instruments,* 802 F.Supp. at 985. Hence, plaintiffs have recited allegations that, if taken as true, establish that TDI was DesOrmeaux's *alter ego.*

Some of the statements in the complaint constitute legal conclusions, upon which the Court need not rely. *See, e.g.,* Compl. ¶ 58(a) ("DesOrmeaux is personally liable as to the matters herein alleged by operation of Texas law...."). Other statements could be interpreted as mixed statements of law and fact. *See, e.g.,* Compl. ¶ 58(d) ("TDI was inadequately capitalized...."). However, the standard and burden of proof applicable to a Rule 12(b)(2) motion are such that the factual allegations stated in the complaint suffice to establish plaintiffs' *prima facie* case for asserting personal jurisdiction over DesOr-

effect that TDI was DesOrmeaux's *alter ego,* and argues that jurisdiction over TDI should be imputed to DesOrmeaux, although it addresses

these arguments to the *Kreutter* analysis. Thus, the Court does not frame its analysis out of whole cloth.

meaux. *See Ball,* 902 F.2d at 197 ("If the defendant is content to challenge only the sufficiency of the plaintiff's factual allegation, in effect demurring by filing a Rule 12(b)(2) motion, the plaintiff need persuade the court only that its factual allegations constitute a *prima* facie showing of jurisdiction.").

Thus, despite the blanket denial of these allegations set forth in the answer, *see* Answer ¶ 58, and DesOrmeaux's affidavit submitted in connection with the instant motion specifically denying many of plaintiffs' allegations, *see* DesOrmeaux Aff. at 2 (Def s.' Reply Mem. Law Ex. 2), the motion cannot be granted because the Court must assume the truth of the matters alleged in paragraph 58 of the complaint. *See Kinetic Instruments,* 802 F.Supp. at 986 (finding jurisdiction under the "fraud" prong of the piercing doctrine on the basis of the plaintiff's allegations, despite the defendant's affidavit denying the alleged fraud); *see also General Textile Printing & Processing,* 891 F.Supp. at 950 (citing *Kinetic Instruments and Ball,* 902 F.2d at 197).

Viewing the facts in the light most favorable to plaintiffs and taking plaintiffs' factual allegations as true, as required for the purposes of determining a motion to dismiss for lack of personal jurisdiction, the Court finds that plaintiffs have made a sufficient showing to defeat the instant motion by reciting factual allegations constituting a *prima facie* showing of *alter ego* status. Accordingly, TDI's consent to New York jurisdiction is deemed to bind DesOrmeaux personally. Due process concerns are not implicated by such an exercise of personal jurisdiction because consent to jurisdiction in a given forum obviates the necessity of a minimum contacts analysis. TDI consented to the jurisdiction of this Court, and if it is assumed, as it must be for the purposes of this motion, that TDI was DesOrmeaux's *alter ego,* then the corporation's acts must be deemed to be DesOrmeaux's own and DesOrmeaux must be deemed to have consented to such jurisdiction. DesOrmeaux therefore has no liberty interest in the jurisdictional objections that he waived by consenting to jurisdiction. The ruling on this motion, needless to say, is without prejudice to the parties' ability to raise the personal jurisdictional issue again after discovery.

## CONCLUSION

Accordingly, for the reasons stated in the foregoing, defendant's motion to dismiss for lack of personal jurisdiction is HEREBY DENIED. The parties are directed to appear for a pre-trial conference in Courtroom 18B of the United States Courthouse at 500 Pearl Street, on May 16, 1997 at 3:00 p.m.

**SO ORDERED.**